07-3106 consolidated with 07-3464 people v. Harvey Wright Will the lawyers who are going to argue this case step up and identify yourselves for the record? Scott Main appearing on behalf of Harvey Wright My name is Bill Tofanetti. I'm appearing on behalf of the people Now you've all been here before and you've sat through some of the other arguments, so we don't have to tell you the drill, right? You're entitled to 15 minutes per side, but who knows whether you'll get more time. You can reserve whatever time you need for rebuttal and proceed when you're ready. Scott Main appearing on behalf of Harvey Wright Good afternoon, Your Honors. May it please the Court. My name is Scott Main and I'm appearing on behalf of Harvey Wright. I would like to focus my attention here today on the first argument contained in the brief. The DNA error? The DNA argument. I believe it bears mentioning, however, that five of the seven errors raised in the brief are all asking for a new trial. The sixth error, the State has conceded, although we disagree on the matter of whether or not that requires a remand for resentencing. I'll be happy to answer any questions the Court has. Let me start off with why did you need that DNA information? Why did we need the DNA information? Because we were confronted with a case where the only reason that charges were brought against Harvey Wright in this case was by... No, no, no. What I want to know is what are you going to do if you receive the information? What are you going to do with it? We're going to, once we receive the DNA information, I mean, obviously the first step is to grant Mr. Wright a new trial. Let's assume you get the information, what are you going to do with it? We now have a very probative, relevant piece of evidence that when you're dealing with... No, I want to know what you're going to do with the evidence. What are you going to do with it? We're going to... You have the information now as to how many nine loci cases there are. We now know that there are 903 pairs of individual in the Illinois database that match with nine or more loci. In this case, we have a nine loci match. But in this case, wasn't he the only nine loci match? That's how the whole ball got rolling? Well, that would be an assumption. I mean, that's a first assumption. And again, I mean, this is beyond in terms of... Obviously, I'm not a representative from the Illinois State Forensic Lab. When you're running a sample against the database, do you run it up until you get your first hit? Do you run it clean through to the entirety of the database? That would be a question for an expert. These are all questions that I think... All right. So you're telling us you need the information to give it to your expert? Is that what you're telling us? Absolutely. And this is, I mean, precisely what now happened in the Juan Luna case. The information was requested. The information was granted over state's objection. The Illinois Supreme Court overruled the state's objection and ordered that this test run. The test was run. The information was then provided to the Juan Luna jury. Basically, what happens in most cases... See, we're on a different plane. Of course we're on a different plane. No, no, no. I'm talking about between what I'm asking you and what you're answering. Okay? Okay, you're going to give it to your expert. What is your expert going to do with it? My expert is now going to be able to talk about why the product rule, which is where you get these astronomical numbers, why that is not the only question we need to be asking when you're dealing with a cold hit database case. And so in this case, where the only evidence that's linking our client to the offense, where you have no eyewitnesses, where you have no physical evidence beyond this forensic DNA evidence, that the product rule is not a fair or it's while we're still accepting the fact that that's a true number. Why is that the only evidence when you ran a consent defense? Well, that's what he, we sought to exclude this evidence prior to trial. We sought to. I understand, but he didn't appeal on that basis. He went on to assert the consent defense. Are we to simply assume under the circumstances that these judicial admissions were lies? I'm sorry? That the judicial admission that's made when you interpose a consent defense, that that was all fabrication? Well, first things first. The consent defense was offered at trial. The defendant did not testify. Was it argued at all, though? Was consent ever argued? Consent was part of defense counsel's opening statements. That's a judicial admission. Okay. Was it in the closing? In the closing, reading through the closing, it was really just sort of there. Reasonable doubt? It wasn't straight reasonable doubt, but it's we need to really question. We have some issues here, and there are a lot of holes or questions we have about this witness's testimony. In the opening, there was actually a statement made that there would be a consent defense. That there would be a consent defense. All right. Let me ask you this, Mr. Maine. I want to understand what you understand certain evidence to mean. Now, as far as the initial, there's evidence that was taken from undergarments of this victim, and there was evidence obtained from rectal swab, and the two are not the same. Correct? Correct. There were three samples gathered. Okay, three samples. All right. Vaginal swabs. Yes, and vaginal swabs. But the actual testimony about the, I may have them flip-flopped, but the rectal swab was the nine loci match. There was no 13 loci match. No, that was due to an error on the part of the forensic scientist. Only ran the first test, the profiler. All right, and then by that time, his testimony was that the sample dried up or something. That's the best we can say. Now, going on to the undergarments underwear evidence, there was testimony that Mr. Wright could not be excluded as a donor of the DNA in the undergarment evidence. Is that correct? That's correct. And then the other expert went on to explain that the likelihood, and this is how it's normally testified to about probabilities, that the likelihood, so he could not be excluded as a donor, correct? Correct. Now, that doesn't mean that you or I couldn't be excluded as a donor. Correct. All right, it meant that Mr. Wright could not be excluded as a donor, right? Right. All right, and then there was further testimony. I'm just trying to see if we understand how we understand this testimony, because I have a question. So then another expert says, or maybe the same, that the likelihood of another individual having the 13 loci that were present in this DNA sample, the likelihood or the probability of that matching another human being was one in so many... 421 trillion. No, 420 trillion. Okay, that's for a male black, then there was for a male white, and then there was for a male Hispanic. 420 trillion black. Is that correct? No, actually, Your Honor, those numbers are in relation to the probability of the random match probability based on the rectal swab. That's based on the nine loci that were tested. That's not based on the sample from the undergarment? The undergarment sample, the numbers are different, and actually they're higher. Right, they're higher. There's a specific reason why they're higher. Wait a minute, Mr. Maine, I just want to ask you something. Did the witness, if it was a he or she, say that Mr. Wright could not be excluded from the 13 loci match of the sample from the undergarment? Right, yes. Did he also say that the probability of another 13 loci match for DNA of a donor was one in so many, however... 420 trillion. All right, now, is that how you understand the testimony? There is a critical distinction between those two probabilities. The first probability is, and I believe the testimony was, the one in 420 trillion African Americans, 670 trillion. This profile will be expected to occur at random based upon a random understanding of our population statistics. In regards to the underwear sample, what they were testifying to is that approximately 5.4 quadrillion and 4.3 quadrillion and 66 quadrillion unrelated individuals cannot be excluded as the male contributor. How many? High numbers, astronomical numbers, but these are astronomical numbers that can't be excluded, and attached to our brief is the appendix, and I've got the, you know, if you'd like the chart. The numbers you're talking about are in the quadrillions. They're in the quadrillions, but when you look at that chart... Which is a number bigger than any number that I've ever heard, quadrillion. Absolutely, yeah, we're up to, I think, 15 zeros there. All right. So he can't be excluded, but so can't 500, what, how many? One in 520, one in 5.4 quadrillion people can't be excluded, or this profile cannot be excluded. How many? Wait, I'm not following. 5.4 quadrillion black, one in 4.3 quadrillion white, or one in 66 quadrillion Hispanic, unrelated individuals, cannot be excluded as the male contributors. One in that many? Cannot be excluded, and the reason why they cannot be excluded, and this is where it's critical to look at, this is a partial profile. This is not a complete match in the way that it was for the rectal sample. Here you have, on the first three alleles, you have an incomplete sample. You have one number at an allele, and then at the second number you have an incomplete, you have an inconclusive result. On the final four results, you have findings that could either be a match or an exclusion. Will the additional four loci increase or decrease the ratio? When you're working through the product rule, if the product rule is the system that we're starting off with, for every additional loci that you're testing, you are then going to increase the probability that you're going to create a larger number. Of what? Of those who cannot be excluded, or the class that could be excluded? When you have an exact match, as we did with the first nine on the rectal sample, and this is, again, this is my best understanding of the evidence, and this is why, once we get to these findings coming out of Arizona, and this finding out of Arizona. Isn't it a for sure, at least in my thinking, that the lower the amount of loci that you have, the less improbable it is to exclude members of that class, which may be homo sapiens or blacks or whatever, okay? So that the deficiency in the number of loci helps you rather than hurts you. Well, the reason why it really helps us is now that when you become aware of actual... Well, it helps you because if you have only nine loci, you will find more matches. At which... So that if you have statistics that are astronomical for the nine, you would have to go to the string theory and get more universes involved to increase the odds. But I don't think that's true, and I think that what we're finding out currently, I mean, this is obviously, this is developing. This test in the Juan Luna case occurred as the numbers were being run in this case, and it's because there's some fundamental questions that people have about how we've arrived at these astronomical numbers based on the product rule. But the danger with that evidence is that once you hear these probability statistics, which is all they are, these are based on extrapolations that were created by the FBI. They started with a pool of people and created a certain likelihood that you would have a match or a 15-16 on one allele. What's your most optimistic scenario of what would have happened if you had the discovery that you were seeking and the cross-examination if you were prevented from doing it? Well, step number one is obviously we would not be proceeding on a consent defense. No, but what, not numerically, in terms of the ratios, what's your most optimistic speculation? 1,800 people out of 2,200. But that's anecdotal. Are you challenging the universe of discourse? These ratios are mathematical based on the universe of discourse, I imagine. Would that change because the anecdotal immediate ratio is different or would that simply generate heat without generating light? Because it might influence a jury, but should it? Should it not? Because it doesn't have a mathematical foundation. It shouldn't, should it? Should they just go to the anecdotal possibility that somehow or another these astronomical statistics, by coincidence, don't bear out in this given sample? Well, you start with the proposition that there is a, these numbers are based upon a calculation of what they believe this, how random a certain profile would be if you were to take a sampling of unrelated individuals and determine how likely it is that these nine loci would match up in the way that they do. Now, what's happened when they're starting to look at these databases, there's questions that are coming out. And so, first and foremost, you were asking for math. What's talked about in the brief is that there's two competing, there are competing notions out there between the product rule and the database, which is a random match probability, and the database match probability. So just to begin, if we want numbers, the way one arrives at a database match probability is you have to deal with the fact that in a cold case where you don't have any other evidence that's pointing towards this being the offender, and you're running a known sample against a database, there's going to be math, science, statistics, everyone is saying that you are going to be expected to find a match, be it coincidental or actual, the larger the database grows. And that's what happened when they ran the test in Juan Luna and found 903 pairs of people that matched at nine. Now, to create a different manner of how these numbers... Are there any studies for this for the probability with the 13 loci? Well, there wouldn't be. I mean, again, with the 13, we're dealing with a situation where it isn't a match, and so the numbers... Where it isn't a match? It's a match at eight, and then there are five other of the alleles at which it could... I mean, two of them could be an exclusion. I thought he couldn't be excluded. He could not be excluded based on their findings because there was so small a sample that they were not able to determine if it was a 6-6 or a 6-8 at one. If it turned out to be a 6-8, that would be an exclusion. So your understanding of this testimony is that this evidence doesn't support that the DNA sample was in any way connected to him? I mean, I feel somewhat unfortunate. I think I'm doing the cross-examination on what the state's evidence would have been had they been given the opportunity pre-trial to be able to actually confront the scientific evidence. And what I'm saying is that there are questions to be asked, and there are manners in which this evidence should be put forth in front of a jury because obviously this was found to be relevant here in another Illinois case. It was put forth by a jury, put forth in front of a jury. The state suggests that the defendant was arrested and initially brought into this case because of the 9-loci match, but that the match was corroborated by the 13-loci guy that indicated that he was the assailant. Sure, the word corroborated is a fair word. What word is not fair is match. What is your understanding that he couldn't be excluded, but are there 5 million other people out there that can't be excluded as well from the 13-loci match? Tell me that. Is that what your understanding is? That's not my understanding. What is your understanding? My understanding would be obviously this is going to be a smaller number. This is, you know, when we're dealing with 903 pairs of people out of 220,000, clearly that means that there aren't, you know, it's not if the chances of somebody else in this room matching up at the same 9 as me probably isn't great, but once you get to a set number, at that point you're going to expect to find people that match up at a certain amount of profiles. That's with the 9, though, right? That's with the 9, and that extends out to the 13, and if we had a full 13, then we wouldn't be able to. Well, how does it extend out to the full 13? I'm not following that. First and foremost, we do not have a full 13. Yeah, but, again, the question is that. In which sample is there not the 13? In the underwear sample. That's not my question. No, that's my question. Go ahead. Go ahead. He said there's no 13. Well, Your Honors, I mean. You and the State have different arguments about what the evidence shows. The State, you know, refers to this as being a match, and, you know, what we actually see. Well, I don't know what you're handing us. I'm handing you the 13. Do you want to see the 13? Is that an evidence in this case? Objection. Is there any objection? Any objection? It's part of the brief. It's part of the brief. And what you're seeing are, when you're looking at the underwear profile, which is here in the third column, there are eight that do match, but there are two in which the findings were, or three in which the findings were inconclusive, and there were two in which it could be a match or it could be an exclusion. And that's where you get language such as, the defendant could not be excluded as the sample. So when the State is referring to this as a match, that's not a fair assessment of what the evidence is. You're saying it's not a match. He can't be excluded. He can't be excluded, but it's not a match. If there were a 13-point match, I mean, obviously that's what we're striving for in terms of the use of this DNA evidence. That's why the FBI has set up the CODIS database, which is based on. What you want to do is show that if there are multiple offenders who could have matched up with the first nine loci, that they would also then not be excluded from the sample that was obtained from the victims' underwear in this case. I think logically that is very much a possibility. All right. But the bottom line, and, I mean, what all this is about, is that this is evidence that should have been provided to the trier of fact. This was evidence that was kept from the trier of fact, and by virtue of this being excluded, they were, I mean, their hands were tied at that point. And your written motion requesting this is in the record, isn't it? Yes. All right. I mean, the written motion basically refers to. . . But because this is so scientific, why didn't you have an expert make an offer of proof on all of these things? Well, this was all happening at the very time that these motions were being litigated. I mean, there was the Juan Luna case. The test happened. . . That was happening in a separate matter from this matter, in which the trial judge refused to allow this test to run, whereas the trial judge allowed the test to go forward, and the Illinois Supreme Court ordered the test to proceed in that case, which obviously the evidence was found relevant, admissible, put forth to the jury. Competing experts were able to testify to its significance. And that obviously is something when you're dealing with these partial profile matches, which is in both of these situations, be it a 9 loci or the 13 loci in which he can't be excluded. These are partial profile matches. Well, the State does suggest that there was no offer of proof and that this was not preserved in any motion for a new trial. I believe the motions themselves set out in detail what the. . . I mean, the relevance of what that. . . You know, counsel, that you have to not only object and then preserve your objections by way of a motion for a new trial. And when you want to present evidence, you do have to make some sort of offer of proof so that the reviewing court, forget about the trial court, so that the reviewing court can properly analyze whether or not what was being sought was something that should have been given. We have three things, then, to look at. The first and foremost is obviously in the motions, which set out its relevance and set out why they felt this evidence should be able to. I mean, first, if you're not going to exclude this evidence, we need to be able to confront this evidence. And one way to confront this evidence is to introduce the findings out of Arizona and to run a similar test here in Illinois. When they proceeded on these motions, the trial attorney initially stated we're proceeding on the pleadings and then made additional argument in specificity. But was primarily relying on the pleadings in terms of what they were proceeding on. At the end of that hearing, they made it clear for the record, they wanted it known and noted in the record that this matter needed to be preserved. There's two motions, and this needs to be preserved for the appellate court. Council, time's up? It was up about five minutes ago, or ten minutes ago. Why don't you wind up in about a minute if you can. Given the extraordinary power that DNA evidence has on juries, thorough confrontation of the evidence is critical to achieve a fair and reliable jury verdict. As a matter of practice, we should be striving to characterize the probative value of evidence with as much transparency, precision, and conservatism as possible. Harvey Wright was denied his right to a fair trial by not being allowed to properly confront the scientific evidence that was going to be presented against him. For these reasons, we ask that this court grant him a new trial. Thank you. You'll have a chance to rebut. Good morning, Your Honor. Once again, my name is Bill Tafanetti. I'm an Assistant State's Attorney for Cook County. Your Honor, this issue is in the main unreviewable because there is no record upon which this court can address and decide the substantive issue of the DNA statistical frequency and whether there's any problem with that. Defendant obviated the issue by switching to a consent defense. Now, defendant claims that he was more or less forced to do so by adverse rulings from the court. That is not true. The defendant raised in a motion to exclude evidence because of the destruction of a DNA sample as an alternative form of relief that he be allowed to go into the CODIS database to detect whether or not there were nine loci pairs. However, when the judge ruled against him on that motion, he did not ask for a ruling on the alternative form of relief. He never addressed it. When he asked the judge to reconsider the original ruling, he did not address the alternative form of relief. And on the morning of trial, the morning that they were to go to trial, the defendant filed an amended motion, an amended answer to discovery, in which he indicated he was going to go to a consent defense. Consent defense is one that obviates the issue because it admits to the fact. But he didn't, in fact, do that. I'm sorry? He didn't, in fact, go to a consent defense. He indicated that he would, but he didn't. He stood on the, from what I understand, he didn't present any evidence to further the theory that she consented. His lawyer stood up in open court. And expressed an intention to go to a consent defense. But should we hold that against the client if, in fact, they never went there? Yes. Why? Yes. Because it's the lawyer's call to determine how the case is to be tried. And what defendants. But the rulings were, let's assume that there would be no problem here with preserving the error by way of an offer of proof, by way of proper objections and post-trial motions. At that point, all you would have is an expression of intent from the defense counsel to go to a consent defense, which he then discards. Would he then be entrapped in the mere expression of his intent? What do you mean, discards, Your Honor? He doesn't pursue a consent defense. But defense counsel got up in open court and argued to the jury that. . . Oh, he did? Yes. It was an opening statement, but he didn't rehash it in closing. Is that right? That's what Mr. Maine told us, that he did argue consent. . . I shouldn't say argue. But he didn't argue it in closing. I'm sorry? He did not raise consent in his closing argument. Well, that's because he didn't present any evidence. Well, but there may already have been evidence presented in this case based on the fact that the defendant, that the victim accompanied the defendant and went into a public place without telling, without protesting and accompanying the defendant again into the alleyway. So the evidence was there, but he didn't argue it. Well, he argues strike that. He did argue that she was unbelievable because she spent four hours in the defendant's presence and claimed she could not identify her. Where did he say that? In his closing argument. In fact, it's one of the things our assistant was specifically responding to. But in the opening he said that there was a consent issue. Is that right? Yes. Further, he didn't preserve it. Okay? If there is a problem with this evidence, and this is the heart of the question, if there is a problem with the statistical evidence and the method that we arrive at that statistical evidence, it is incumbent upon the defendant to make a record. He cannot. . . So basically, counsel, what you're doing with this argument is saying, well, maybe he has to lose on this trial, but he'll win on an effective assistance allegation later in his post-conviction petition. That's his relief. That's his relief. But the only evidence is this DNA. Do you think the trial judge should deny any effort by the defendant to present something to cast any kind of a shadow on this? The defendant didn't make an effort. That's my point. The defendant walked away from it. On the morning of trial that they began, the assistant state's attorney addressed the court and said that she had spoken to trial counsel and that it was her understanding that he was not going to be calling any experts and that he was also not going to be asking any questions about the police. . . But hadn't the judge already denied his motion to. . . No, this is the motion. She was making a motion to ask the court to. . . The day of trial she was asking for this? This is a motion in limine. Absolutely. Page CCC 9 of the record. I'm talking about. . . And defendant defense counsel said correct. He was not intending to ask questions on cross-examination on this issue. Now, he did attempt to and the judge denied it because this was already agreed to. So here we have a defendant who attempts to try a case under one theory and loses and now wants to go back and try it under another theory. Point of fact, tactically, and I'm not bottom lining on whether there was a waiver here of these arguments by virtue of a representation that he's going to go into a consent defense, but in point of fact, if you open with something on opening statement, if you make a promise to a jury or a commitment to the jury that you later ignore in your closing argument, you haven't urged a defense. You've simply furthered your defeat because the jury will then say, where is this evidence that he told us, that he promised us. . . Be that as it may. Be that as it may. There is no offer of proof. There is no indication whatsoever that he had any kind of expert testimony who could have come into court and testified under oath, subject to cross-examination, that there was any problem whatsoever with the method of calculating these statistics. And these statistics are damning, and the defendant doesn't argue otherwise. The point of the fact is, this case was tried under one theory, all right, and the defendant did not challenge the evidence of his identity. He only challenged whether or not the victim was lying about whether she consented. That's the gravamen of his entire closing argument. Now he wants to go back and challenge the statistics that condemn him. Well, he's not allowed to do that. Our Supreme Court has made it clear that defense counsel cannot have it both ways. He cannot alter his trial strategy by making the best of a trial court's order and depriving the reviewing court of a reviewable record and still maintain the order was erroneously entered. This court asked a lot of substantive questions of my opponent during his first argument, because you don't have a record that answers these questions. Well, we ask those questions to every advocate, as devil's advocates, to get to where we want to find the case when we have to write our opinions. You don't have findings by the judge that you can review. Our questions are not evidence of what your rights are. You do not have findings by the trial judge that you can review for abuse of discretion. You do not have any evidence that you can review, sworn evidence, testimony subject to cross-examination on the subject of the mathematics that you can review. Okay. Isn't the hearing where the judge denied his motion for this nine loci, if that's how it's pronounced, in the record? There is no hearing in our record. No hearing in this record. Okay. There was never a hearing on the nine loci match conundrum. Okay. There is simply no evidence of it. He says there's a written motion in the record. There is. Okay. Defended by the motion, a written motion, asking the court to borrow evidence of the DNA, okay, because of an entirely separate issue, the destruction of a sample of DNA. Yes. Okay. As part of that motion, he asks for an alternative relief, which is to go into the nine loci match database thing. But he never asked the court to rule on that. He never presented any offer of proof. He never got a ruling, and it's incumbent upon the defendant to get a ruling. So the court didn't deny it? Never addressed it, not one way or the other. All right. That's what you say in your brief, so we do have that. Is there anything more? No, thank you. It's been most entertaining. Thanks, counsel. Two minutes for rebuttal, Enoch. I'll try to do it in one. We'll accept the gift. I think that the ruling was actually had on the motions. I mean, particularly when, at the conclusion of the ruling, counsel makes clear we have two motions, we're labeling one supplemental, we want it known that these are matters that we're going to be addressing before the appellate court. Counsel did inartfully draft the post-trial motion, which they just mentioned these pretrial motions to exclude the evidence based on, I believe, it's Rule 407 or 417, but doesn't specifically make reference to the fact that within those motions is the Arizona, the request for the testing on my database. And the thing I didn't mention while I was, you started to indicate that if we don't take care of this matter now, this will just have to be addressed in a post-conviction proceeding of trial counsel's ineffectiveness. We don't even have to go that far. We do have a crankle claim, and one of the claims that the defendant raised pro se in this post-trial motion. Was ineffective assistance raised? Was ineffective assistance. And was it considered? Was there deliberation? The trial court believed that he didn't have jurisdiction initially because he felt the crankle motion was filed late. And when he was looking at the motion, he felt they all went to strategy. But one of the things, and again, obviously this is pro se and this was inartfully drafted, he indicated that the attorney who had worked up the pretrial, the defense counsel in Northrop who had done all the pretrial work on the DNA evidence, who was knowledgeable of the Arizona study, and who was also instrumental in getting the court to allow this testing to be run in Juan Luna, was no longer a part of the office. And had he been able to present the contents of this to the trial court, and if this were able to be brought forth to the judge, I believe, you know, again, he just says things would have been different. But these matters were in front of the court before trial.  That was specifically referring to the test, the auto search test run in the Juan Luna case, which they were not going to talk about. They attempted to cross-examine the state's expert regarding the Arizona study. And then post-trial, it was, you know, it wasn't properly written in the defense counsel's motion, but the crankle motion, which is an issue in our brief, that that matter should be adequately addressed. And we don't even need to get to that because either under just straight plain error, I mean, we have a denial of the defendant's right to confront this evidence. And I don't think by going forward on the day of trial, knowing that he wouldn't be able to confront this evidence with a consent defense, should it all change his ability to actually protect his rights to compromise. I'm not sure that plain error covers the substantive error. It may have to attack it through ineffective assistance of counsel. But the prime problem with inadequate offers of proof is that it doesn't facilitate any consideration on review. So the fact that it's plain error still leaves us with that deficit. When you think that you have to go to string theory in order to find someone else who's going to match at nine loci, and in Arizona they find 144 pairs of people that match at nine, I think that that absolutely changes the way that we need to think about this evidence. Thank you. Thank you. Very ably argued and very ably briefed, and we'll be taking